TUCKER, Judge.
On the present occasion, we are solemnly called on by the appellants, in their bill of complaint, to decide, whether an act of, the general assembly, entitled, *'an act concerning the glebe lands and churches within this commonwealth,” could deprive the protesiant episcopal church in the parish of Manchester (of which they style themselves the vestry and church wardens) of the glebe in that parish, heretofore purchased, while this country constituted a part of the British empire, for the use of the minister of that parish, for the time being, and his successors forever ?
This is a question which I most sincerely regret has ever been agitated. At the commencement of our happy revolution, that reverend body of men, who then filled the pulpits in this country, far from inculcating the doctrines of passive obedience and nonresistance to the invaders of the rights of their country, were zealous in her cause, and not only by precept and exhortation, but even by example in numerous instances, demonstrated that no selfish considerations of the possible consequences of a change of government, could influence them to swerve from that noble attachment to the liberties of their country, which communicated zeal and energy to others : And, if ever men in their station deserved the esteem of their country, that meed was due to the established church in Virginia, at that period. That the convention did not explicitly provide for the security of their rights by a constitutional declaration, is an omission, of which I pretend not to know, or to assign, the cause.
Nor can I less regret, that this question, on which the legislature were so repeatedly urged to pass a law, was so long, and so repeatedly avoided and procrastinated by them, that the reasons which might have operated with those who had participated in the debates in the convention, have either been totally forgotten, or are still remembered, only by a few, who have either retreated from the service of their country, or have been appointed to serve her in some other department. But most of all, I regret that this truly important question did not receive that solemn discussion and decision, which it was intended it should have received, on the very day that robbed Virginia of the oldest, and one of the *most distinguished characters that remained of those who held a place in her revolutionary councils ; and of judicial talents, which will ever mark that day in the calendar of unfortunate events. A decision, at that time, would probably have reconciled the doubts of all who doubted ; and would, have produced acquiescence, at least, in those who were not convinced.
But, since it has been reserved for me to^ have a partin this truly important decision, I shall, on the present occasion, deliver that opinion, -which a diligent and minute en-quiry into the subject, and a candid investigation of the grounds and principles, according to which it must be decided, will enable me to pronounce. And, if in this investigation I may appear to be prolix, that circumstance I hope will acquit me of precip-itancy in forming my judgment.
As a preliminary to the due understanding of this question, it may be proper to take some notice of the common law doctrines concerning parishes, glebes, parsons, church wardens, parishioners and vestries.
1. Parishes. These constitute a part of the ecclesiastical division of England. It seems agreed, on all hands, that, in the early ages of Christianity, parishes were unknown there ; or, at least, signified the same as a diocese does now. There was no appropriation of ecclesiastical dues to any particular church : Every man was at liberty to contribute his tithes to whatever parish, or church, he pleased, provided only that he did it to some. But it was ordered by the laws of king Edgar, about the year 1790, that “ Dentur omnes décimas primarias ecclesias ad quam parochia pertinet.” The lords, as Christianity spread itself, built churches upon their own demesnes, or wastes, to accommodate their tenants in one or two adjoining lordships; and obliged all their tenants to appropriate their tithes to the maintenance of one officiating minister, instead of leaving them at liberty to distribute them as formerly ; and this tract of land, the tithes of which were so appropriated, was called a parish. 1 Black. Com. 112, 113, 114.
*When lords of manors first built churches on their own demesnes, and appointed the tithes of those manors to be paid to the officiating ministers, the lord who thus built a church, and endowed it with a glebe, or land, had of common right a power annexed of nominating such minister as he pleased, (provided he was canonically qualified,) to officiate in that church of which he was the founder, endower, maintainer, or, in other words, the patron. 2 Black. Com. 21.
The manner in which these endowments of the church, by annexing thereto a glebe, or land, for the maintenance of the parson, *1106 was made, does not appear. Probably, as deeds and conveyances were at that time in little use, the endowment was made in the same manner as the feudatory’s or tenant’s estate was given ; that is to say, by the ceremony of corporal investiture, open and notorious delivery of possession to the incumbent (or feudatory) in the presence of the other vassals, or tenants, of the manor. 2 Black. Com. S3. And this, while feuds were granted for life only, put the incumbent into the same situation, precisely, with respect to his glebe, as the other tenants or vassals were in, with regard to their feuds. And this ceremony, of a public and notorious investiture, is still preserved in the case of parsons in England, under the name of induction: which is performed with even greater solemnity than the ancient livery of seizen : which ceremonies respectively were indispensably necessary to complete the title both of the feudatory and the parson. 1 Black. Com. 391; 2 Black. Com. 311, 312. “ In whom the fee simple of the glebe,” (says sir Edward Coke) “ is a question in our books. Some hold it is in the patron ; but that cannot be for two reasons. First, that, in the beginning, the land was given to the parson and his'successors ; and l he patron is no successor. Secondly, the words of the writ of juris utrum be, si sit libera eleemosyn a ecclesiae de D., and not of the patron. Some hold that the fee simple is in the patron and ordinary ; but this cannot be for the causes above said : and, therefore, of necessity, the fee simple is in abeyance, as Eittleton saith.” 1 Inst. 341, a.
*A parson is a corporation by the common law ; and if lands be given to A. B., parson of the parish of Dale, and his successors, this gift shall enure as a gift to the use of his church, and shall go to his successors, parsons of that parish. Co. Eitt. 8, b. But, if the gift had been made to the church wardens of the same parish, and their successors, for the use of the church, the gift would have been void; for church wardens are not capable of purchasing lands for the use of the church, but they may purchase goods for its benefit. 1 Inst. 3, a.; Wood’s Inst 88 ; Finch. Daw, 88, 178. For as, on one hand, the parson of the church is a corporation for the taking of land, for the use and benefit of the church, and not capable of taking goods, or any personalty, on that behalf; so, on the contrary, the churchwardens are a corporation to take money, or goods, or other personal things, for the use of the church ; but are not enabled to take lands. 2 P. Wms. 126.
What I have said with regard to a parson’s being a corporation at common law, is to be understood with some qualification. For parsons were not civil corporations by the common law ; nor are they so at this day, even in England ; but ecclesiastical as members of the established church. 1 Black. Com. 470. They were erected for the furtherance of religion, and perpetuating the rights of the church. Ibid.
Parishioners are a body politic to many purposes : as to vote at a vestry, if they pay scot and lot; and they have a sole right to raise taxes for their relief, without the interposition of any superior court, may make bylaws to mend the highways, and for repairing the church ; and making a bridge or any such thing for the public good. 8 Mod. 354, argo. Jacob’s E. Diet, word Parishioner.
The parishioners, or inhabitants, or probi homines of Dale, are not capable of purchasing lands. Co. Eitt. 3, a. But Mr. Hargrave, in a note, refers to a case in Dyer, 100, of a grant by the crown, probis hominibus de Islington, rendering rent: and in 4 Inst. 297, sir Edward Coke mentions *the grant of a privilege within a forest, to all the inhabitants being freeholders within the forest, as good by the forest law.
By the common law, the parish rates must be made with the consent of the major part of the parishioners, housekeepers, or occupiers of lands. In order to which they must have notice of a vestry, (a place so called from the vestments of the minister kept there, and in which the meeting of the parishioners is held,) and then all absent are concluded by the majority of them that are present, who, in the construction of law, are the whole parish. Wood’s Inst. 90 ; 2 Stra. 1045.
By custom, however, these may be select vestries. Ibid. But lands for the use of the church must be purchased in the name of trustees. Ibid.
If any sole, or aggregate corporation, ecclesiastical or temporal, (for the words of the statute be si quis religiosus vel alius,) purchase .lands or tenements in fee, they have capacity to take, but not to retain, unless they have a sufficient license in that behalf ; for within the year after the next alienation, the next lord of the fee may enter, &c.; and, for default of all the mesne lords, the king. Co. Litt. 2, b.
Corporations, whether sole or aggregate, ecclesiastical or temporal, being merely creatures of the law, it seems reasonable to presume, that the laws of England, respecting them, which were in force at the time the colony of Virginia was first settled, were brought over hither at the time; and where not altered or repealed by legislative or constitutional acts, remain in force, by virtue of the ordinance of convention, May 1776, ch. 5, (edi. 1785, p. 37.) But ecclesiastical corporations, (or more properly speaking, bodies politic,) being erected for the ¿urpose of perpetuating the rights of the established church, must be presumed to have ceased, as soon as that constitution was established, which did not admit of any establishment of religion in Virginia; and therefore the laws which regarded them as part of the body politic, were repealed by the revolution.
*And with respect the capacity of persons to purchase and hold lands, the same conclusion seems also to be reasonable ; these being general laws, not local in their nature, or confined to the kingdom of England.
If these inferences are just, it will, then follow, that neither church wardens, vestries, nor parishioners, are, by the common law, capable of purchasing or holding lands, for the use of the church.
And that parsons, unless by special license, could not hold against the crown, although they might purchase lands, to them and their successors, for the use of the church. And as all escheats, penalties and forfeitures heretofore going to the king (except such as the legislature may have abolished) now go to the commonwealth, if there be any case of a pur *1107 chase of lands by a parson for the use of his church, without license, the forfeiture (unless saved by the repeal of all British statutes) will go to the commonwealth. And, if, as judge Blackstone informs us, 2 Black. Com. 268, the king might have entered on the lands so purchased in mortmain, for the forfeiture, it follows, that the commonwealth may now do the same. Sir Edward Coke’s text is, “Within the year after the alienation, the next lord of the fee may enter ; and, if he do not. then the next immediate lord from time to time to have a year, and for default of all the mesne lords, then the king to have the land so aliened forever.” Co. Litt. 2, b. This opinion of judge Blackstone, that the king may enter for the forfeiture by aliening lands in mortmain, does not seem reconcile-able to the general maxim that the king can neither take, nor part with, any thing but by matter of record. 3 Black. Com 250 ; Einch. Law, 82. And, in the same passage, the commentator proceeds to say, That it is a part of the liberties of England, and greatly for the safety of the subject, that the king may not enter upon or seize any man’s possessions upon bare surmizes, without the intervention of a jury ; and for this he cites Gilb. H. of the Exch. and Hob. 347. I incline therefore to doubt, whether the king might have entered for the forfeiture in such a case, ''or not. Nor is it perhaps material, as to that particular case : although the principle, as it applies to the means by which the commonwealth may acquire the possession of lands in cases of forfeiture in general, may possibly be deemed of the utmost importance to the community. And this appears the more reasonable, because, even in case of treason or felony, “ the lands of the traitor or felon, nor even his goods, cannot, saith sir Edward Coke, 2 Inst. 48, be granted to any : no, not so much as by promise, nor any of his lands, or goods, seized into the king’s hands, before attainder.” And surely this principle is as necessary to be cherished in a commonwealth, as under a monarchy. And indeed it has been expressly recognized and adopted by the legislature of this commonwealth in the act of 1785, ch. 81, edi. 1794, ch. 15.
Be this as it may, the legal title to the glebes in Virginia must, according to the preceding view of the rules of the common law, have been made either to trustees, or to the parson and his successors, by a special license, (without which they were liable to forfeiture) or to some person or body politic authorized by law to purchase, and hold lands for the benefit of the churches, respectively, for which they were intended as an endowment. We must therefore enquire,
1. Whether by general provision to be found in the colonial laws, any person, or persons, or body politic or corporate were declared capable in law to purchase, or to take and hold lands for the use of the churches in the several parishes in the colony, or not ?
The act of 1661, ch. 3, preserved in Purvis, entitled, “glebes to be laid out,” is wholly silent as to this matter, declaring only, “ That for the better encouragement and accommodation of the ministry, there be glebes laid out in every parish, and a convenient house built for the reception and abode of the minister, according to his majesty’s instructions.”
*The king, according to the theory of the then existing government, being absolute lord of the soil, the appropriations made pursuant to this act, and those instructions, bear a very strong analogy to the original donation, or endowment of the churches by lords of manors upon their demesne lands in England. And it is probable that a patent or conveyance was thought necessary for the glebes so set apart, under that act. Eor the king being the lord of the soil was regarded as the patron and founder of their churches, which seems for a time to have occasioned some disputes in the colony concerning the right of presentation.
It seems presumable that above thirty glebes were appropriated to the several parishes under this law (see Mercer’s Abridgment, title, Parishes); and it is equally to be presumed that no patent or conveyance for any of them can at this day be found, unless such as might be given by will.
The act of 1696, ch. 11, a manuscript copy of which I have seen, after reciting that the law then in force, entitled, “ glebes to be laid out,” in making such provision doth appear very deficient, and uncertain, repeals the same : it is then further enacted, that every vestry shall be, and are authorized and empowered, where the same is not already done, to purchase and lay out a tract of land for the glebe, in their discretion, and at the charge of their respective parishes ; and likewise to build a convenient dwelling house for the reception and abode of the minister of such parish.
The several acts of 1727, ch. 6, and 1748, ch. 28, are made in confirmation of the authorities given by this act; and the latter particularly makes that a duty in the vestry, which the former only gave them authority to do ; the words are, “ That in every parish, where a good and sufficient glebe is not already purchased and appropriated, a good and convenient tract of land shall be purchased by the vestry, and assigned and set apart for a glebe, for the use of the minister of such parish and his successors, in all times hereafter. And it is thereby declared and enacted, that the vestry of every such parish shall have power, and they are ^thereby authorized and required to levy the charge of the glebe land and buildings on the litheable persons in their respective parishes.” Words cannot well be more explicit than these, both as to the purchasing of the glebes, and as to the manner of paying for them.
The vestries in Virginia were not composed as it appears they generally are in England, of the parishioners, or a major part of them assembled in vestry, as before mentioned ; but resemble the select vestries, which by custom, are to be met with in some parishes there. They seem to have been constituted at a very early period of the colony, “for making and proportioning levies and assessments, for building and repairing the churches and chapels, provision for the poor, maintenance of the minister, and such other necessary uses, and for the more orderly management of all parochial affairs.” And for those purposes, it was enacted that twelve of the most able men of each parish *1108 be by the major part of the parish chosen to be a vestry, out of which number two church wardens to be yearly chosen by the minister and vestry ; and in case of the death of any vestryman, or his departure out of the parish, the minister and vestry were to choose another in his room. I,. Virg-. 1661, ch. 2. These vestries then were to have perpetual succession according to that constitution; and although there is no express declaration either in that, or any subsequent general law, that they shall be a body corporate and politic, and be capable to purchase and hold lands for the use of their respective churches, yet I conceive it to be a necessary and unavoidable inference and deduction from all these acts taken together, that they were, and should be regarded as a body politic for those purposes.
■ To this there may be two objections:
First. That the king, by virtue of his prerogative, was the only person that could erect either an ecclesiastical, or lay corporation, 10 Co. 33, b. ad finem ; and that this must be done by charter, Ibid. That every corporation must have a name, &c.
*To this i.t may be answered, that the king’s assent to the first of these acts must be presumed, and that it was expressly given by the act of 1748, ch. 28, as appears by a note in the margin (Edi. 1769, page 250): and that even in England, corporations have been created by act of parliament, the king’s assent to which is either equal to the grant of a charter, or a waver of his prerogative, in that respect.
That, in creating' a corporation, the law does not seem to require any set form of words, 10 Co. 30 ; and that it is held, that if the king grants iands to the inhabitants of D. their heirs and successors rendering rent, that for any thing touching those lands, this is a corporation ; but not for other purposes. 1 Bac. Ab. 500.
That as neither the parishioners, nor church wardens were capable of purchasing lands for the use of the church, and it might be doubtful whether the ministers or incumbents could do it without a special license, if the vestry could not hold the lands, the intention of the law would be wholly frustrated, for want of some body capable of purchasing and holding the lands, for the use of the churches. Co. Eitt. 94, b.
That the purchasing of lands for the use of the churches, being a duty prescribed to the vestry, it must be intended that the legislature meant to authorize them to take the conveyances to themselves, and hold the lands for the uses and purposes prescribed by the act. For all incidents are ever implied by a statute. 2 Inst. 221.
Seoondly. It may be objected, that the great number of private acts, which were made from time to time by the legislature, in which the vestries were expressly declared to be empowered and made capable to take, receive and hold any land to be purchased or given for a. glebe for the use of the parsons of their respective parishes, for the time being, forever, manifest','fife opinion of the legislature in all those cases to have been, that, without such a clause,- the vestries would not have befen capable of taking and holding lands for those purposes. Vid. the -acts of 1734, ch. 20; 1736, ch. *22; 1738, ch. 20; 1740, ch. 4; 1742, ch. 30, 31 ; 1744, ch. 19 and 31, and probably many more.
To this I answer, that notwithstanding the greatest respect is certainly due to the opinion of the legislature respecting any matter of law, yet the opinion of the legislature, where it is only collaterally manifested, does not constitute the law ; and even where such an opinion is directly expressed, if it be only by way of recital, and not made part of an enacting or declaratory clause, such opinion, so expressed, does not conclude the judiciary from examining into, and pronouncing the law to be, what according to their best judgment it shall appear to them. Therefore, although it does undoubtedly appear from these private- acts, that the legislature most generally thought such a clause necessary to enable the vestries to take and hold lands, yet that might be only the effect of abundant caution. Nor are wanting instances where such clauses have been wholly pretermitted. Virg. Laws, 1732, ch. 18 ; 1744, ch. 19, 23, 25.
Upon these grounds, I conceive there is a strong presumption that, from the year 1696, to the period of the American revolution, the vestries in Virginia were a body politic, capable of purchasing and holding lands for the use of the ministers of thfeir respective parishes; and capable of a perpetual succession, for those and other parochial purposes. And secondly, that the legal titles to all the glebe lands in Virginia, purchased since the year 1696, were at the period of the revolution vested in 'the vestries of the respective parishes, unless the contrary, in particular cases, be shewn.
2. I shall now proceed to enquire, Whether the legal title to the glebes, thus supposed to be vested in the vestries of the several parishes respectively, still subsists and remains in those bodies ?
The act of October 1776, ch. 2, § 4, declares, That there shall, in all time coming, be saved and reserved to the use of the church by law established, the several tracts of glebe land already purchased, as also the perpetual benefit and *enjoyment of all private donations theretofore made, for the better support of the said church and its ministers. This act may therefore be regarded as a confirmation of the legal estates vested in the vestries, as well as of the uses and purposes for which such legal estates were held.
By the acts of May 1780, ch. 22, and May 1782, ch. 36, the vestries in twelve counties beyond the Blue ridge of mountains were dissolved.
In May 1784, ch. 33, an act occurs to empower the vestry of Antrim to sell the glebe, and to purchase one more convenient for the use and benefit of the minister of the said parish, for the time being, forever. Several other like acts may be found since the revolution.
And, in October 1784, ch. 43, I find an act authorizing the vestry of the parish of Manchester to straighten the line between the glebe land of that parish and the lands of William Logwood, and to exchange, by deed, to be recorded in the court of Chesterfield county, such parts of the glebe land as will by this méans be annexed to the land of *1109 •the said Log-wood, for such parts of his land, as will be annexed to the said glebe.
By an act of the same session, 1784, ch. •88, for incorporating the protestant episcopal church, all former vestries were declared to be dissolved, on the day before the Monday in the next faster week ; and an entire new mode of electing vestries was established : and all former acts for the support of the clergy were repealed. A general election of vestries throughout the state was directed to be held the ensuing Monday in Raster week, and thereafter on the same day in every third year.
By this act, the minister and vestrymen of the several parishes in this commonwealth, at that time (or in case of a vacancy), the vestry of each parish and their successors forever, were made a body politic and corporate by the name of the minister and vestry of the protestant episcopal church in the parish where they respectively reside, with capacity to. purchase and hold lands ; and the glebe- lands, &c. were *vested .in them and their successors forever, with an exception of the glebe lands in the county of Augusta.
The succeeding .year, 1785, ch. 12, another act passed authorizing the election of vestries in all those parishes where it had not already been done in pursuance of the former act, and declaring them, when elected, to have the like capacities, &c.
By an act of the next year, 1786, ch. 12, the act for incorporating the protestant episcopal church was repealed. Saving, to all religious societies, the property to them respectively belonging; who are thereby authorized to appoint, from time to time, according to the rules of their sect, trustees, who shall be capable of managing and applying such property to the religious uses of such societies. And to guard against all doubts and misconstructions, it is further enacted and declared, that so much of all laws, now in force, as prevents any religious society from regulating its own discipline, shall be, and is hereby repealed.
The act of 1788, ch. 47, declares, that the trustees of the protestant episcopal church and their successors shall, to all intents and purposes, be considered as successors to the former vestries, and shall have the same power of holding and managing all the property formerly vested in them, whether for charitable purposes, by private donation, or in trust for the use of individuals.
As the bill no where states that the complainants were elected vestrymen and church wardens, pursuant to the act for incorporating the protestant episcopal church, nor, that since the act for repealing that act, they were appointed trustees for the managing and applying the property belonging to their church, I might here close my remarks upon this particular case, by observing shortly, that the complainants have not shewn any legal title in themselves, under either of those acts. But, as this question is considered as a general one, in which the constitutionality of an act of the legislature may be questioned, if a clear and perfect case were made out on the part of the legislature, X shall proceed.
The act of 1798, ch. 9, expressly repeals all those acts, (viz: October 1776, ch. 2; October 1779, ch. 36; 1784, ch. 88; 1785, ch. 37; 1786, ch. 12; 1788, ch. 47); but does not notice the private acts before mentioned; so that the act concerning this particular glebe may perhaps not be affected by this act.
Without stopping (for the present) to consider what effect the private act of 1784, ch. ' 43, may have upon this particular case, let us endeavour to discover the effect of the other acts, which may be deemed public, or at least more general acts.
The act of 1784, ch. 88, for incorporating the protestant episcopal church, in the preamble sets forth, “That the clergy of the protestant episcopal church, by their petition presented, have requested that their church may be incorporated.” This petition may, therefore, be considered a§. a surrender on the part of the clergy (if not of the vestries) of their former rights and privileges : Which, says judge Blackstone, is a kind of suicide, and one of the modes by which a corporation may be dissolved. And the act made in consequence of that petition, seems to amount to an acceptance of that surrender, by the general assembly, on the one hand, and the declaration that the former vestries should be dissolved on the Easter Monday following, and that all former laws concerning vestries, glebes and churches, should be repealed, seems to bé a kind of parliamentary sanction given to that transaction, and amounts, I presume, to an absolute dissolution of those bodies, by a legislative act, which is another mode by which the ancient books agree that a corporation may be dissolved. 1 Black. Com. 484.
But whether this petition on the part of the clergy only, without any concurrent act done by the vestries, would of itself amount to a surrender of their estates in their glebes, might be doubted; but wherever the vestries concurred in carrying the act into execution, it would seem that the consequence of all these things taken together, must have been a complete dissolution of the former bodies politic, and the ^acceptance of an entire new constitution. 3 T. Rep. 197, 585, 587, 589; 1 Eonbl. Eq. 307, n. For, by the last mentioned act, the clergy were made a component part of the body politic, with the vestry, whenever there should be a vacancy in the church. Whereas the vestry, before, had in them probably the legal estate in the fee simple of the glebes, although the parson had the whole beneficial interest therein, and even a freehold at law from the moment of induction ; and this interest had a retrospect to the time when the former incumbent ceased to be the incumbent. And this rule of law was founded upon the principle that a corporation never dies. So that the rights of the incumbent, by a kind of jus postle-rninii, were supposed to have relation back to the day of his predecessor’s death. This principle, I conceive, was abolished by the revolution ; for parsons being ecclesiastical corporations for the purpose of perpetuating the rights of the established church, must have ceased to be corporations, as soon as the established church was abolished. Which the counsel for the complainants have admitted was the effect of the revolution. Again, the new vestries had not in them the *1110 power of continuing their own succession, as the former had; but were to be elected triennially by the members of the protestant episcopal church, in their parish, &c. So that wherever a new vestry was chosen, with the assent of the former, (either express or implied), it would seem that an entire new body politic was created, in whom the property of the former body politic, and of the beneficiary, for whose use the glebe was held, was, by the joint consent and agreement of all parties, and with the sanction of the legislature supe'radded thereto, vested as completely as it was originally in the former vestries.
To this it may be objected, that a body politic may be incorporated by one name, and after by another name, and then they shall use their name according to their second incorporation; and, yet shall continue their possessions, and all other franchises and privileges, which they had before by the other name. 4 Co. 87. So that in this case there was *no dissolution of the body politic, in whom the legal estate in the glebes was vested ; but a mere alteration in the style and name of the body politic, with alteration as to some of its privileges, but none of those which relate to its capacity to hold lands for the use of the minister of the parish for the time being.
To this it may be answered, that under the former laws and constitution of the colony of Virginia, the parson, and the vestry were considered as part of the general body politic, or state ; and not as a mere private incorporation, with capacity to hold lands, to a certain amount, for a special purpose: The former being a branch of the hierarchy for the monarchical constitution, and engrafted upon the government itself; whereas, the latter were, at most, an eleemos-inary body, for private, although in some measure, spiritual purposes : and that the acceptance of such a private foundation, in lieu óf their former privileges, immediately connected with the government itself, must be construed as a total surrender of their former state ; and an acceptance of an entirely new, and essentially different, constitution of incorporation.
And if this should be the true light in which the act for incorporating the protestant episcopal church ought to be viewed, it will probably lead us to get clear of some of those embarrassments in which this complicated and intricate question is involved.
Tor if this ancient body politic, which formed a branch or member of the constitution, was actually dissolved, either by the rejection of the king as supreme head of the church, at the time of adopting our present constitution, or by the act incorporating the protestant episcopal church, it would seem that, in either of these cases, the ancient right was wholly discontinued, and that upon such dissolution of a body politic, all the consequences incident to the dissolution of a body politic, by the common law, would immediately follow. And then the question would turn upon the right which the legislature possess to dispose of that property, otherwise than the law had already disposed of it, eo instanti, that a dissolution of the ancient body politic took place.
*There is still one point of view in | which this question (as a general one) may be considered. The object for which the ancient vestries were appointed was, among others, that ministers for the established church might be elected from time to time without the church remaining, for any length of time vacant. The act of 1748, ch. 28, sect. 7, declares, “that the sole right of presentation shall be, and remain, in the several vestries, for and during the term of twelve months next after a vacancy shall happen in their respective parishes.” Here we may ask, where no presentation has been made by any ancient vestry, for twelve months after a vacancy, if the act were still in force, could such vestry, the vacancy still continuing, rightfully present to the church, according to what is said in 2 Black. Com. 276, 277 ?
By the ancient usage, and probably by virtue of some law, or instruction from the king, which I have not seen, or heard of, the governour of the colony was (as I have understood) entitled to present. And if he neglected to do so, for a certain time, then the bishop of Bondon, and, after all, perhaps the king, by his prerogative. Now the revolution certainly annihilated this part of our ecclesiastical constitution. The forfeiture incurred by the lapse, would consequently accrue to the commonwealth, by the 20th article of our constitution. But the governour could not in this case present; for he is absolutely prohibited from exercising any part of the royal prerogative. Constit. Virg. art. 9.
Here we may ask, whether the ancient vestries were to be considered as the patrons of the church ? Tor although the period in which a lapse might be incurred, had elapsed, yet if the patron should present, before any presentation by the bishop, the metropolitan, or even by the crown, such presentation by the patron was good. 2 Black. Com. 277.
I confess I can find no grounds to consider them in this light: they were neither the founders, nor donors, of the churches and glebes ; but merely parochial officers.
If then, their authority extended no further than the act of assembly may be supposed to give it, after the lapse of ^twelve months, without presentation, the right of presentation was forever lost and gone from them ; and until the legislature should provide for the manner in which, under such circumstances, the church might be filled, it must forever remain vacant.
Now, when the end of an institution is gone, the institution itself is gone. 12 Mod. 19 ; 1 Show. 280 ; 1T. Rep. 214, 241, 248. Consequently, in those parishes where there has been no incumbent for twelve months, the ancient vestries can never more present an incumbent; and the end of the institution in every such case being lost, the institution itself is gone ; or, in other words, the vestries are forever dissolved.
But by the common law, if lands are given to a corporation which is afterwards dissolved, the donor shall have the lands again;, for the law annexes such a condition in every grant to a body politic, Co. Hitt. 14, b.; and Rdward Coke says expressly, that no writ of escheat lieth in this case ; but it would seem, that the donor or grantor, may re-enter. Ibid. It is true that Mr. Hargrave expresses a doubt upon it. But judge Blackstone has adopted *1111 the opinion of lord Coke, 1 Black. Com. 484: and his authority is decisive with me in this case. 1 Fonbl. Fq. 308, n.
Here, then, the question, who were the donors of the glebes in Virginia ? immediately presents itself.
To which we may venture to answer,
1. That, presumptively, the crown was the donor of the glebes, appropriated antecedent to the year 1796. For the act of 1661, (which I suspect to have been of earlier date,) entitled “glebes to be laid outand which refers to his majesty’s instructions, will not, I think, admit of any other construction.
2. In all cases where donations of glebes, by deed or will, can be shewn, there can be no doubt, except where there may be a defect of heirs of such donors.
3. But the most difficult part of the question still remains, viz.: who are to be regarded as the donors of those glebes *which fall neither under the first, nor second, head above mentioned ?
In moral justice, it would seem, that they should vest in the parishioners of the parishes, to which they respectively belong ; at whose charge and expense they were purchased, without regard to distinction of religious sects, or denominations, since all were obliged to contribute, and did contribute to the purchase. But, anxiously as I have sought the law to support this moral principle, I have not been able to find it. That the legislature of Virginia, however, have, from time to time, acted under the influence of it in particular cases, I think may be demonstrated, by examining the private acts which have passed on the subject of the glebes and churches in Virginia, as in the acts of 1730, ch. 18.19 ; 1732, ch. 16, 18 ; 1734, ch. 19 ; 1736, ch. 16 ; 1738, ch. 20 ; 1742, ch. 31 ; 1744, ch. 23, 25, 27, and probably many others ; in which, upon a division of parishes, those parts of the ancient parish, to which the glebe theretofore purchased should fall upon the division, were required to compensate the other part, for their proportion of the glebe, church, &c. The act of 1744, ch. 31, is indeed an exception to this course of proceeding : The glebe in that case being assigned to one part of the ancient parish, without any compensation to the other parts from which it was separated by that act.
Cogent as this moral principle is in my mind, and fortified as it is by the many instances which occur in the acts of the legislature, which I have just referred to, since I cannot discover any principle of law to support it, I am driven to seek for the law of the. case elsewhere: and consequently to say, that, if the property in them could not, upon the dissolution of the body politic in whom the legal title was vested, revert to the parish, that is to say, to the parishioners, at large, it must have vested in the commonwealth : for no other owner can I find for it, under the existing laws of the land.
But the case of Burgess v. Wheate, was relied on to shew that the complainants were entitled to hold the lands *to their own use, if the body politic for whose use the glebes were purchased, were, in fact, dissolved. It is enough to say, that, in the case of Burgess v. Wheate, the trustee had a grant of the fee simple to him and his heirs. The vestries, it is presumed, never had a grant or conveyance made to them in those terms. If the present glebe was conveyed to the present complainants in that manner, they should have shewn it. And whenever it shall appear that the right to any glebe has been conveyed in that form, it will be proper to examine the question. But if they claim as successors, and not as heirs, the right of succession, I conceive, is at an end.
Taking it, therefore, that the mere act of rejecting the king and the ancient constitution of the colony, and adopting one totally different therefrom, did operate an immediate dissolution of every part of the body politic connected with, and dependent upon, the ancient constitution, or form of government; or taking it, that these subordinate parts of the body politic might continue to enjoy such parts of their ancient rights (not incompatible with the new constitution) as the legislature, in their wisdom, should permit, I am constrained to say, 1. That the ancient vestries were dissolved, either by the change of government, or by the act for incorporating the protestant episcopal church: and that the new bodies corporate, consisting of the minister and vestry (or in case of a vacancy in the ministry), in the vestry alone, were private incorporations, essentially differing from the former, and owing their existence and their rights, solely to that act of the legislature : And, 2. That the property in those glebes, which were either in fact, or in contemplation of law, given to the ancient parishes by the crown ; or which were purchased by the ancient vestries for the use of their respective churches did, in fact, (but whether constitutionally, or not, will be examined hereafter,) pass and vest in the new incorpo-rations, authorized by the act for incorporating the protestant episcopal church, wherever the inhabitants of the parishes did proceed to elect, and did elect vestries, ^'pursuant to that act. 3. That upon the repeal of that act, in 1786, the property in the glebes was not thereby taken away, from those new incorporations, but that they might continue to hold the property as trustees, under the saving clause, until other trustees should be elected; and that such last mentioned trustees were an incorporated body, as well as the vestries and ministers, in virtue of the word successors, in the act of 1788, ch. 47. Which word, when applied, by the legislature, to the capacity to take and hold lands, I apprehend doth, of itself, make the body capable of taking by succession, a body politic. For if land be given to J. S., parson of the parish of Dale, and his heirs, it should be a donation to his individual capacity : But, if it be given to him and his successors, the church shall have it, Finch. Haw, 88 : And sir Fdward Coke supposes, that if lands be given to John, bishop of N., and his successors, and to John O., and his heirs (being one and the same person), he is tenant in common with himself. Co. I/itt. 190, a. If the king grants land to the men or inhabitants of D. and to their heirs and successors, rendering rent, for any thing touching these lands, this is a corporation. 1 Bac. Ab. 501.
3. Our next enquiry, therefore, must be, Whether the property thus vested in the ministers and vestries, or the trustees thereafter authorized by the act of 1788, ch. 47, to be *1112 appointed, for the use of the protestant episcopal church, still remains in them ? or, in other words, Whether these newly incorporated bodies are still of capacity to hold the glebes for the use of that church, or have been, and are dissolved ?
Now, the act of 1798, ch. 9, expressly repeals the act for incorporating the protestant episcopal church, (1784, ch. 88); the act to authorize the election of certain vestries (1785, ch. 37), the act to repeal the act for incorporating the protestant episcopal church (1786, ch. 12), and the act for giving certain powers to the trustees of the property of the protestant episcopal church (1788, ch. 47); and declares the same to be void, and of none effect.
Consequently, unless that act be contrary to the constitution of this commonwealth, these newly incorporated bodies are likewise dissolved.
That such corporations may be dissolved by the authority of the parliament or legislature alone, without the intervention of judicial proceedings, has been practically evinced by the dissolution of the monasteries in England (Stat. 27, H. 8, ch. 28; 31 H. 8, ch. 13 ; 37 H. 8; ch. 4) ; and seems never to have been questioned in that country: And, in Virginia, both before and since the revolution, the legislature has never scrupled, it would seem, to exercise the right, whenever the occasion seenied to require it. Acts 1744, ch. 35 ; 1753, ch. 18, 23, 24 ; 1757, ch. 20, 26 ; 1758, ch. 11; 1759, ch. 22 ; 1762, ch. 32; May 1777, ch. 20, 21;. October 1777, ch. 32,36 ; October 1778, ch. 13 ; May 1780, ich. 22; May 1782, ch. 36 ; 1784, ch. 89, and many others.
But'it has been said, that these acts were passed upon the application of the parties concerned in interest. This, though, was not always the case ; for they were often passed on the application of those who were hostile to the existing vestries : And the frequent recognition of this right in the legislature by such application, may have authorized an application of the maxim “communis error facit jus.”
However, as these acts may have been passed sub silentio, without their validity, or the power of the legislature to pass any of the like nature, being questioned, even by the legislature, this court must be bound to examine into their validity, whenever the question is brought before them.
This is an unpleasant, and in some respects an arduous, task ; for surely no task can be more arduous than that of reconciling the conflicting, and even opposite, acts of the legislative body. If they cannot be reconciled to each other, it will be our duty to pronounce those to be valid, which are most easily re-concileable to the dictates of moral justice, and the principles of the constitution of this commonwealth.
*Two principles, neither of which can, or ought to be, shaken by this court, or by any authority in the state, are to be found in our bill of rights, art. 1 and 16.
First, that the right of private property ; and,
Secondly, that the right of conscience in matters of religion, shall be held sacred and inviolate.
A third principle, scarcely inferior in point of importance, and not inferior in point of obligation is, That no man, or set of men, are entitled to exclusive or separate emoluments or privileges from the community, but in consideration of public services. Art. 4.
What are public services ?
Such, in which the community have, or may be presumed to have, a common interest.
Can the dissenters from the protestant episcopal church (infinitely more numerous than the adherents to that church) be presumed to have a common interest, with them, in the promulgation of religious tenets, of which they disapprove, and from which they avowedly dissent ?
If this be the fact, of which I believe no doubt is entertained, are the members of the protestant episcopal church entitled to receive from the community at large, exclusive, or separate emoluments, for teaching doctrines, from which a majority of the community dissent, as the rents and profits of the glebes must be considered as an annual stipend paid bjr the commonwealth to the ministers of the protestant episcopal church?
If the legislature had thought proper to appropriate the glebes and churches purchased and built, at the expense of all the parishioners, in each parish, for the use of such minister, or teacher of religion as a majority of the parish should choose, without regard to sects or denominations of religion, whether Christian, jew, mahometan or other whatsoever, this article, I apprehend, would not have stood in the way of such a general appropriation. But where one religious society (inferior in numbers to several others, and perhaps to any other) receive exclusively a bounty from the *state, such exclusive bounty, so long as it remains exclusive, must, I conceive, appear to be granted in opposition both to the letter and spirit of the article. And if it be, the grant is void.
This interpretation does not, I apprehend, in the least, interfere with, or violate that fundamental principle of our constitution, that private property shall be sacred and inviolable.
The glebes, as such, were never private property. They were purchased at the common expense of the whole parish, and (according to the prevailing maxim of the government at that time) for the common benefit of all the parishioners, without distinction.
The revolution put an entire period to the maxim, that “mankind may be benefitted by the promulgation of religious doctrines, from which they wholly dissent.”
From that moment, the promulgation of the religious doctrines of any religious sect ceased to be a common benefit to the community.
But the incumbents of the respective parishes had acquired legal rights, under the existing laws, which the legislature were too just to violate. A life, or lives in being, would not long retard the operation of any plan, which might be recommended by the change of constitution, and of principle, which had taken place. Besides, those incumbents, who, upon the faith of the existing constitution and laws, had qualified themselves for the function to which they were elected, and renounced all other pursuits on that account, had acquired a moral right to *1113 be continued in the enjoyment of their legal estates, thus acquired.
So far as any act of the legislature has operated for that purpose, it may be considered as pursuing the injunctions of moral justice, and of the first article of our bill of rights. Beyond that point, I conceive every such act to have been void.
If one act of the legislature be void, as repugnant to the constitution, a subsequent act, declaring such repugnant act *to be void, and repealing it accordingly, cannot be contrary to the constitution in that respect.
'The act of 1798, ch. 9, repealing the act for incorporating the protestant episcopal church, and several others relating to the glebes, therefore, is not itself unconstitutional.
The consequence is, that the newly incorporated bodies, incorporated, authorized, and continued by those acts respectively, have no longer any legal existence, being entirely dissolved.
It follows that the plaintiffs, as vestrymen, have not any legal title to the glebe.
It is not alleged that there is any incumbent ; and, in the case of Whitechurch v. Hide, 2 Atk. 391, lord Hardwicke allowed a demurrer to a bill, which prayed an injunction ; because the plainti ff ought first to have established his title at law. But the plaintiffs, in this cause, claiming no title to the premises, except as vestrymen, or the successors of vestrymen, they have, according to my interpretation of their case, no title at law.
But let it be supposed, that the act for incorporating the protestant episcopal church is not void, upon the ground I have taken, viz. as being repugnant to the fourth article of the bill of rights. Even that ground, I conceive, will not avail the plaintiffs, if they claim to be a vestry or trustees under that, or any subsequent law.
Eor the legislature, at the time of passing that law, either did, or did not, possess the constitutional power of dissolving- the former body politic, created for the express purpose of endowing the church by law established, and pursuing the property thereof for the use of the ministers. Acts 1748, ch. 28.
If they did possess the power at that time, there can be nothing shewn, I apprehend, to prove they did not possess an equal power to dissolve the body corporate created by the act for incorporating the protestant episcopal church : And consequently the repeal of that law was equally constitutional *as the repeal of the former law, made before the revolution, for the better support and maintenance of the clergy.
If they did not possess this power, then the act for dissolving the former vestries, and for vesting the property in the church theretofore established by law in the protestant episcopal church, was unconstitutional and void ; and consequently, any title which the present complainants may make to be a vestry, or trustees, under that act, or any subsequent act, made in support of such their claim, must be wholly illegal, and ■without foundation.
But it has been suggested that the protestant episcopal church is, in doctrine and communion, if not in constitution, the same
as the church heretofore by law established.
If this point can avail the plaintiffs, they must prove it : But this, if I have not been misinformed, it will be impossible for them to do. Eor,
1. By the constitution of the church by law established, no minister could be admitted to officiate in this country, but such as should produce to the governour a testimonial, that he had received his ordination from some bishop in England : The constitution of the protestant episcopal church, it is presumed, is satisfied by an ordination in this country, or elsewhere in the United States.
2. The constitution of the church, by law established, required, that the canons set down in the liturgy of the. church of England for celebrating divine service, and administration of the sacraments, be duly observed andkept. And that every minister, before he should be inducted into the parish, should subscribe to be conformable to the orders, and constitutions of the church of England, and the laws there established: Whereas the constitution of the protestant episcopal church (if I have been rightly informed) does not acknowledge the authority of the canons of the church of England, nor require subscription to the thirty-nine articles, nor to be conformable to the orders and constitutions of the church of England, and the laws there established.
* Ithese things be so, (and if they are not, it is incumbent upon the plaintiffs to shew that they are not), the church heretofore by law established, and the protestant episcopal church are not one and the same, either in constitution, or in doctrine and communion.
3. By the constitution of the church by law established, the parson as parson, was an ecclesiastical corporation, endowed with certain exclusive rights for the purpose of perpetuating that church : But, the principles established by the revolution being incompatible with those rights, the rights themselves were absolutely destroyed by the revolution ; and were incapable of revival, so long as our present constitution remains. The protestant episcopal church, therefore, can have no claim on this ground.
Consequently, the protestant episcopal church can have no other claim to the property heretofore belonging to the church by law established, than what it derives from the act for incorporating it. And that act, upon the ground I have taken, is either unconstitutional, and void ; or, if constitutional, it has been repealed.
But it is contended that the repeal is unconstitutional.
The ground upon which this proposition is founded, I presume is. that a right of property once vested by a legislative act, cannot be divested by a legislative act.
This is bringing us back again to the question, Whether the legislature could constitutionally divest-the property heretofore belonging to the church by law established, out of that body politic; and vest it in the protestant episcopal church, as a new and distinct body corporate ? But, in that point of view, I have already decided the question.
Eet us suppose, however, that no question *1114 could be made on this subject; and that the glebes, throughout the state, had by any means (the constitutionality and legality of ■which could not be questioned,) revested in the state ; and that the legislature had then thought proper to incorporate the protestant epistopal church, and to vest the glebes in a I body corporate, for the use of the min- ' isters, would it be competent *for the legislature to repeal this act in toto, thereby dissolving-the body corporate, and resuming their grant, made for the use of the ministers ?
If the legislature, without any consideration whatever, but merely mero motu, grant lands to a private person, in his natural capacity, without any fraud, or fault on his part, such donation .1 hold to be irrecoverable, under the first article of the bill of rights. But where the legislature creates an artificial person, and endows that artificial person with certain rights and privileges, either in respect to property, or otherwise, this must be intended as having some relation to the community at large ; and the consideration upon which such artificial body was created, or endowed with all, any, or either of its rights and privileges, seems to be examinable, as well by the legislature itself, as by the courts of justice. And if such creation, or endowment, be either unconstitutional, or merely impolitic, and unadvised, the legislature, I apprehend, is competent to amend, or repeal its own act, provided it do not annul, or avoid any private right, which may have been legally acquired by any individual in his natural capacity,' under such act: whereas a court of justice can only pronounce the act void so far as it contains any thing, which the constitution of the commonwealth prohibits the grant of.
The legislature, therefore, I conceive, were competent to the repeal of the act for incorporating the protestant episcopal church ; and of all other acts vesting, in that church, the property theretofore belonging to the church by law established, so far as they have repealed them. But if by such repeal they may be supposed to have offered an injury to the legal, or vested, rights of any individual, such rights cannot be affected by the act of repeal: and the parties are still at full liberty to defend those rights in a course of law : nor can it be justly said, that the act prescribes that to be done, which can be done only in the ordinary course of the administration of justice. Tor whenever a statute prescribes any thing to be done, all necessary and proper steps are to *be taken as incidents, which in a statute are always supplied by intendment. Thus according to sir Edward Coke, in the statute of West. 1, ch. 31, where it is said, that the king shall seize the franchises into his own hands, this must be intended upon office found. 2 Inst. 221. So, in the present case, the overseers of the poor must pursue that course in the execution of their duty, which the law, in such cases, may render necessary and proper. What that course maj^ be, it would be improper for this court to say ; for it is not our duty to advise, but to judge upon such things as are already done.
Upon the whole, I entertain no doubt of the competent jurisdiction of the court of chancery in cases of this nature, to relieve by granting an injunction, where the complainants exhibit such a title in themselves as in equity ought not to be disturbed. But, in the present case, I think they have failed, altogether, in making out such a case. I am therefore of opinion that the bill was properly dismissed, and that the decree ought to be affirmed.
ROANE, Judge.
This is a bill, by the vestry and church wardens of the protestant episcopal church for the parish of Manchester, in the county of Chesterfield, against the overseers of the poor for the'said county, and the attorney general. It prays to enjoin the sale of the glebe of the said parish, under the act of January 1802, on the ground, that that act could not deprive the said church, in the said parish, of the said glebe; and on that of the necessity of the court of chancery exercising its preventive jurisdiction. An answer is put in, concurring with the bill, that the glebe in question was purchased, before the revolution, under the act of 1748; that the price paid therefor, was levied, in part, upon persons dissenting from the then established church; and that the said glebe is now vacant. A demurrer is also filed ; for that the complainants, if they have title, have complete and ample redress at the common law. The chancellor allowed the demurrer, and dismissed the bill; from which decree, the complainants appealed to this court.
In the view I have taken of the subject, it is, perhaps, unnecessary to discuss the question propounded by the demurrer. I have, however, no hesitation to say, as at present advised, that if the title to the subject in question were in the appellants, a proceeding *in equity, to enjoin the sale under the circumstances of this case, is emphatically proper.
The important question, presented by the bill and answer, may be considered ; 1st. As under the laws existing prior to the revolution ; 2dly. As affected by that event, and the principles of the constitution ; or, 3dly. By the operation of the subsequent laws. Under the first view, it is necessary to ascertain with some precision, in whom, and in what degree, the property of the glebe lands, actually resided. In making this enquiry, we must confine ourselves, to the government and the clergy. The vestry and the other members of the church, stand entirely excluded, by the laws of that aera. They had not, under those laws, as I shall presently attempt to shew, a scintilla of title or of direct interest, either in the glebes or salaries. They had only that secondary interest, which is involved in the maintenance of the church, and the services of the minister. A recurrence to the act of 1748, as well as the preceding ones, will shew, that the vestries were mere agents for the payment of the salaries, and the purchase and reparation of the glebes. They had a mere naked power in relation to the purchase of the glebes, which terminated on its execution. There could be no motive with the legislature, to give them a further interest, than is above stated, and accordingly none other has been given. On general principles, as between the government and the clergy, it would *1115 seem that the entire title to the glebe lands would have been retained by the former. By the establishment of the religion, which took place here, the episcopal became a part of the civil system. There was an union of the church and state, and the ministers of the former, became, in some sense, the servants of the latter. By analogy to the tenure of other public servants, the idea of a title to the public lands, by this class of *them would seem to be reprobated. The most they could expect, would be, the payment of their annual stipend, and the enjoyment of such of the public domains, as might be assigned to them for their accommodation.
But, cujus est dare ejus est disponere ; and we are now by a recurrence to the act itself, to see how the property in question has been disposed of. I will premise that there can be no question that the absolute property of the glebes, resides in the government, except so far as it has been granted out, by it. They were purchased, and paid for, by the government, although they were, eodem flatu, assigned to the clergy. It is no objection to this position, that the price of each glebe, was levied upon the members of each parish. That mode of taxation, although perhaps unequal, was, considering the object in view, at least as justifiable as many other powers recognized and practised at that day. Notwithstanding the force of the general principle before stated, in relation to the general tenure of public servants, which, in a doubtful case, might turn the scale, and which has weighted with the luminous Mackintosh, in relation to the church lands of France, the words of our act are too strong to be resisted. The words, “appropriated,” and “for the use of the minister of such parish and his successors in all times hereafter,” in the act of 1748, are, perhaps, as strong as could be used to convey a property to a body corporate. That body corporate was the minister and his successors, forever. That the ultimate right, however, remained with the government, is evident, not only from the complexion of the act of 1748 itself ; not only because there was no necessity, in relation to the policy and object of the government, to make a further grant; not only because an absolute and irrevocable investiture of the church property, would have disabled the government from resuming that property, in the event of its being deemed proper to change the national religion, and substitute another in its stead, a power admitted to reside in the government, and frequently exercised by the English government, in times not very remote ; but also, *from this consideration, that no sale or exchange of a glebe, was ever made, except by an act of the legislature. The laws and journals of that sera fully justify this position. So, also, in the case of salaries, the government was the real debtor. It only made the contract : It only pledged its faith for the payment. The several parishes certainly made no contract to pay the salaries. This was done by the government, which, simul ac semel, drew on the several parishes (if I may use the expression) and transferred to them severally, its obligation to pay the several salaries, instead of paying them from the common treasury. The history of those times fully bears me out in this idea. Whenever a difficulty arose, in obtaining payment from the parish, application was made to the legislature ; and many instances might be shewn, in which the aid of the legislature was afforded, for the purpose of obviating such difficulties. From this view, it appears, that both the salaries and glebes were derived from the government to the ministers of the established church. Those ministers were only known in that character, and in that of private persons. It would be ridiculous to attempt to show, that the grant was not made to them in their private character. It was then only made to those ministers in their character of ministers of the national church. It was not made to them as ministers of a mere religious society, having certain doctrines and tenets. The then government did think an establishment necessary, as a part of the political system, and that the public good was promoted by the coercion and monopoly incident to such establishment. On this ground, only, however mistaken, however abhorrent to our present ideas, could the government of our country have justified the application of public property to the use of a particular religious society, or of the ministers of that society. I have said that the levies for the purchase of the glebes, were an unequal, though, according to the then prevailing ideas, not an unjustifiable mode of taxation. Whether, however, it were unequal or not, depended on the discretion of the vestries, (the immediate *agents of the parishes,) who might have avoided inequality, by conforming the price of their purchases, to the relative wealth and numbers of their constituents. And in this view also, in the case of a reverter of the property, a restitution of all the glebes to the public at large, would be the same thing with a reverter of each glebe, to each parish. This last mode, however, is probably most just and most equal, and has been adopted by the act of 1802. If the principles above stated be correct, although no shilling of the levies either for the purchase of the glebes, or the payment of ■ the salaries, stopped one moment in the public treasury, in its passage from the people to the ministers, yet the substance and understanding of the transaction cannot be affected. That circuity was avoided for mere convenience, and because there was no necessity for its existence. The glebe lands also, to whomsoever conveyed, were, probably, not conveyed to the government, but the omission of this formula does not alter the case. We are not to be driven from the effect or acknowledgment of grea/t principles, on the ground of mere technical formalities, founded only in convenience, and not going to the substance and essence of the transaction. If we were, what becomes of the title of the episcopal society at large, or as existing in each parish, on the ground that neither the one nor the other was ever incorporated ? But I disdain to try this cause by such a test. I would admit, that if the glebes had been granted, by law to the one, or the other, that grant would stand, substantially, for an act of incorporation. I hold it as an incontrovertible position, that, under our laws, so *1116 ciety of persons cannot take or hold lands, without both an act of incorporation and a grant. The existence of the former gives a capacity, the existence of the latter, only gives, a title. The want of the former may be supplied by the latter, if that latter is grounded on an act of the legislature ; but not e converso : by a liberal construction, we may infer the act of incorporation, from the act of grant; for we need not be technical, and the will of the legislature is manifest: but an act of incorporation, ^singly, is only inchoate, and gives not a right to any thing. I call upon gentlemen to shew, that by any act of the legislature, prior to the revolution, the members of the church, generally, or particularly, were ever incorporated. Let them put their finger upon the passage of the law which has created such corporations. I go further and say, that even in England, no such corporations. ever existed. We had, therefore, no prototype whereon to proceed, in erecting such corporations ; and having none, nor any necessity for it, that measure was not adopted by the legislature. But I will be satisfied with even less than this. Let gentlemen shew any law, or any passage in any law, prior to the revolution, which contained any grant of these lands to the members of the church, either generally, or as existing in the several parishes. My researches have been vain, to find such laws, or such passages. The legislature has -indeed made such grants, since the revolution, but then they had not power to make them: while such power existed, no such grants were made.
In trying this question relative to the title of the glebes, it is important to keep in view, in whom the property in the salaries existed.
They certainly existed in the ministers, and not in the members of the church. On general principles, there can be no reason to differ the titles to the two subjects : to give the one to the members of the church, while the other belonged, exclusively, to the minister. The only difference which could arise between the two, would result from the different natures of the subjects. The salary for one year when earned, became the absolute property of the minister ; and, in like manner, the profits of the glebe, for the time past became a property: but the profits or enjoyment thereof, in future, notwithstanding the words of the act of 1748, stands only on a common ground with future levies of salary. I speak now only with reference to the essence of the title, and the power of the legislature : the technical title of the ministers, to the glebe lands, was, by the terms of that act, paramount to every other influence. In the *case of the salaries, the principal funds of the people remained in their own hands, and the interest, or profits thereof, was assigned to the minister for his stipend, as it became due : In the case of the glebes, their principal money may be considered as invested in • a real subject, for the convenience and habitation of the minister, and the profits thereof accrued to him as the lapse of time made them fall due. In the last case, the deposit of the principal subject was in the minister instead of the people ; but the only intention of that deposit was, that he might have the complete enjoyment of the profits. The technical wording of the act, or, of the deed conveying to him an interest in the glebes, cannot alter the essential nature of the title.
If, then, these two rights are on the same foundation, had the members of the church a property in the salaries when levied ? Certainly not. They had, indeed, some interest therein : that secondary and remote interest, however, which arose from the continuance of the church, and the support of its ministers. They had an interest in the receipt by another, not themselves, of the annual stipend. This is a species of right, which cannot be dignified with the name of property : a species, which is no ground for the interposition of a court of justice. It is a species of interest which is even below the dignity of a “possibility for, by no possibility,. could the members of the church receive a shilling of the salary. The case is precisely the same with, the glebe lands. The minister had a right to hold them. He had an express right even to bring an action of trespass against those who intruded on his possession ; the. vestry and members of the church not excepted ! That vestry and those members had, however, some interest in those lands; an interest consistent in their enjoyment by another; an interest inferior to a mere “possibility.” How .long has it been discovered, that A. can maintain his claim to the property in a subject, by shewing that B. only is entitled ? This is a new species of right for the first time set up in a court of justice If the right of B. which is the principal, *falls to the ground, the right of A. which is the incident, cannot be supported. It would seem to me a vain expectation, that this incidental and derivative interest of the members of the church, should be asserted, otherwise than by asserting the right of the ministers on whose enjoyment, thereof, it depended ; from which alone it could be pretended to arise. Yet the acts of 1776 and 1784, have yielded up the rights of the ministers ; and the church, at whose instance those acts were passed, has caused itself to be associated with them in that title ; thus committing an. in trusión on the possession guaranteed to the ministers by the act of 1748, and enlarging their own interest at the expense of that of the ministers. Independent of those two acts, which are posterior to the revolution, I see no difference between the interest of the members of the church, in the salaries and in the glebes ; and when gentlemen lay stress upon legislative exposition, why do they not admit the authority of the early and unanimous renunciation of the salaries, contained in the act of 1776, even in relation to existing incumbents, and the admission of the power of the legislature over the subject, and of the non-existence of a title in the ministers, unavoidably infer-rable from the two acts of 1776 and 1784. These two acts go infinitely further than the act of 1802, which does not invade the possession of existing ministers. These acts are understood to have been passed at the special instance of the episcopal church, and must be considered as estopping that church from asserting a title in the ministers ; on which alone their interest depends for support.
This species of interest is not peculiar, nor *1117 novel, in this, or any other country ; it runs through every class of public servants, and exists in all the people in relation to all of them. It is, however, no interest whereon a recovery can be founded in a court of justice : it is the officer only and not the people, who has a title. The title then, of the glebe lands, existed at the most, in the established minister and his successors, as a sole corporation, by donation of the government. *In making this donation, the government acted not for itself, but for the people, and any right which now exists in it, exists in the people. By the common law, whenever a corporation is dissolved, the lands revert to the donor, for that condition is annexed, and the cause of the grant faileth. 1 Bl. 484 ; 2 Bac. 32. I presume I may add, without a possibility of contradiction, that the extinction of that corporate character, which alone induced the grant, is, emphatically, a dissolution of the corporation itself. It is also held, that a corporation may be dissolved by act of parliament, which is boundless in its operation. 1 Bl. 484. Without contending for the omnipotence of parliament, or even of the people in a state of revolution ; without asserting a right, in either, to do injustice or destroy the rights of property, I may at least assert, that the just powers of the latter, are equal to those of the former. I suppose, also, it will be readily conceded, that an act of either, entirely and substantially inconsistent with the existence of the corporation, is as much a dissolution of it, as a dissolution by express words. I am willing to admit, also, that a dissolution may be partial, as well as total: partial, in so far as the corporation may be dissolved, by express words, or by the effect of the act at variance with it. This position is a concession in favour of the episcopal church, as it admits that the society of the church of England (if it were a corporation), however it may be, upon the point in question, might survive the wreck of the revolution, in relation to lawful or indifferent matters ; not only (for example) the rights of doctrine and worship, which it holds in common with other societies, but such rights of property as appertain to it as a mere religious society, and do not contravene any constitutional principles.
2d. In the second place, I will consider the effect of the revolution, and the principles of the constitution, upon the subject in question : when I speak of the effect of the revolution, I know I stand upon an important ground. I know, also, the danger of different inferences being drawn, from this source, owing to the different media through which they *pass. I know that some men have more fervour than others ; more sensibility in the cause of equal rights. I know that, from this cause, the inferences to be drawn from this source, will, unavoidably, be tinged and diversified. But there are certain cardinal points, upon which all men must agree. It must, I presume, be admitted by all, that, that memorable event, established, in America, the reign of equal justice, delivered our dissenting brethren, from the tyranny exercised over them, and exempted the rights of conscience, from the power of the civil magistrate. If in aid of these great principles of the revolution, the expressions, or the clear principles of the constitution, are to be found, then indeed we have attained to the acme of human sanction. This desideratum appears to me to exist in the present case. Our bill of rights, on a large and liberal view, comes full up to the point of liberating dissenters from future contributions : and when we reflect, that an instrument of this kind, exists not in detail, and only declares, in general, the great principles of free government, it is supposed, that the 4th and 16th articles thereof are almost expressly in point: at least they give us great principles which are decisive of the present question. There is not a human being who can read those articles, and justify, as constitutional, future exactions from dissenters. This has been universally admitted, from the beginning, in relation to the salaries ; but a difference is set up, in relation to the glebes. I confess, as I have already said, that I cannot see a difference. They stand upon the same reason, if not precisely upon the same ground ; and it must be readily conceded, that the reason of an instrument of this kind, must emphatically apply. The claim of post revolutionary salary, by even a cotemporary incumbent, is justly abandoned by the appellants’ counsel: but the case embraced by the act of 1802, of a vacant glebe, is infinitely less strong. It does not invade the interest of an existing incumbent. It only intercepts the contingent and possible title, which might have accrued to some future minister as successor to the last incumbent. In this view, his remote, ^con tin gent, and possible claim, stands reprobated, as a source of title, by the uniform decisions of this court.
Much has been said, in this cause, of the identity of the protestant episcopal church, in relation to our ante-revolutionary church. I am not disposed to cavil about names, or about trifles. I admit this identity in its fullest extent, in respect to the component members of the church, and its doctrines and discipline. But there is no identity of character between the two. That church, formerly paramount and triumphant, has now taken its just and equal station with other religious societies. Its quality, as a national church, in consideration of which, the grant of the glebes was made, no longer exists. The grantee, in respect of that essential character, is dead, is extinguished, is gone. As in the common case of a grant to A., tenant of the manor of Dale, the grant ceases when such tenancy ceases ; so here the grant faileth, by the extinction of that character of the grantee, which alone induced the grant. Notwithstanding my admission, as above, respecting identity, the presbyterian society may as well set' up this claim, as the society in question : in relation to that character, which induced the grant, it is as much the same society, as is the protestant episcopal church. It is a quibble to say, that this grant was not bestowed in this character, totidem verbis. That clergy then stood only in the character of an established clergy. As a national church, some semblance of justification may be found, for its endowment with public property. But even the enormities of those times, do not justify an appropriation of the *1118 property of the people, to the use of particular individuals or societies. There is no conceivable gTound, which can justify such a conduct, in the government; and the want of such irresistibly determines the character of the grant. In opposition to such principles, it is at least incumbent on the appellants, to show the endowment to have been made to the clergy, in their particular character. But this cannot be done: the words and complexion of the grant itself, confronts that idea, and supports the general principle.
^Besides, this contest under the act of 1802, can only arise with the successors of the ancient clergy. To sustain this claim, there must be a perfect identity between the then and present ministers. An identity in the doctrines and disciplines of the church is not sufficient. But are the now pastors of the episcopal society, elected, and removable, by them, at pleasure, successors to that clergy, who were inducted and established by the government, and held their offices in contempt of the wishes of their parishioners ? Is there, in fact, any identity between them ? Certainly* not. The word “successors,” exvitermini, imports an identity of character.
The important effect now supposed, has been wrought by the revolution. The property in question, for want of an adequate grantee, has reverted to the grantor. If you please, the corporate character of the grantee is destroyed, by the effect of the revolution : it is destroyed, to say the least, as to property taken from strangers to the established church, by coercion, and held from them by violence : it is destroyed, as to the subject in question : That memorable event has tumbled to the ground, the then national church, together with its colleague, the government : It has not tumbled to the ground, and I trust never will, the pure and excellent system of that church, considered as a society of Christians; but that towering and powerful hierarchy, whose progress was not to be arrested, by even the mild and tolerant principles of the episcopal persuasion : that overwhelming hierarchy, which levelled to the dust, every vestige of religious liberty !
Let me not be supposed, sir, to denounce this hierarchy, with too much severity. Is it not known to every sciolist in our laws, that it procured the enaction of a statute, for silencing, and even banishing non-conforming ministers ? Is it not known to every member of this court, that even in the dawn of our struggle against Britain, for civil liberty, many meek and pious teachers of the gospel were imprisoned, persecuted, and treated as criminals ?
*The only crime of these men, was, their worshipping God according to the dictates of their own consciences! There is not a gentleman old enough to know the fact, who has not seen ministers of the gospel of Christ, teaching their doctrines through the grated windows of a prison ! I mention these things, but to shew the character and tendencies of the hierarchal government; the utter-annihilation which then existed, of every semblance of religious liberty !
The revolution, however, has brought down this powerful hierarchy to the standard of free and equal government: the cause of the grant has ceased ; and it becomes unlawful for the church or corporation to act up to the end for which it was established. In this view, of a reversion of the glebe lands, to the government, for the benefit of the people, any after disposition or continuation of them, by law, or by construction, to the use of a particular society, is", in fact, equally with the levies of salaries, a coercive contribution from the dissenters : it stands precisely on a common ground with such levy: it is, equally with it, in the teeth of the bill of rights : it is moreover equally with it in direct hostility with the noble principle, declared in the preamble of the act of November 1776, which I shall presently particularly recite.
It is urged on us, with great vehemence, by the appellants’ counsel, that this is a vested right, and not to be divested, even by the effect of the revolution. I shall not be among those, who assert a right in the government, or even in the people, to violate private rights, and perpetrate injustice. The just end and object of all governments, and all revolutions, reprobate this idea. I trust I shall not be more tardy, than those who are more loud and clamorous, to respect the vested rights of individuals, or societies. My sentiments on this subject have been heretofore delivered in this court, and particularly in the case of Lyell v. Elliott, quoted by the appellants’ counsel. I mean not to retract one iota of what I then said, in relation to this subject. But the question here is, in whom the property in question is *vested ? I may be mistaken in my application and inference, but I bow implicitly to the principle. I apprehend, however, that this position respecting the inviolability of vested rights, only extends to such private and perfect rights, as are not hostile to the principles of the government: such as are unconnected with, and depend not upon, the existence of the government. Such rights, or emoluments, as are inseparably connected with, and depend upon the government, must stand or fall therewith. Neither the government nor the individual can be supposed to have contemplated a revolution, when they contracted ; a state of things, which disfranchises the government, and puts it out of its power to perform the contract on its part. Under a contrary construction, the individual must either receive his emolument, as a sinecure, his duties, in consideration of which it was given, being withdrawn,- or rendered unlawful, or the then system of government be kept up for the purpose of continuing to the individual the complete enjoyment of the contract.
This last idea is outrageous, and deeply affects the expediency, almost under any circumstances, of asserting the right of reform and revolution. A very familiar and analogous case occurs, to exemplify my ideas. By the Virginia constitution, our judges hold their offices and salaries, during good be-haviour. They cannot, during the existence of the constitution, be deprived of either, without a breach of such behaviour. But if the people choose to reform the government, and render their services unnecessary, no man will contend that they shall receive *1119 their salaries for nothing': none will contend, that these men remain judges, or retain their salaries, in that event, although the new judiciary system, be precisely similar to the old : none will assert, that for the sake of perpetuating to those officers, their emoluments, a system of government shall be kept up, which is injurious to the interests and hostile to the wishes of the people. But the case in question, although it has received, did not require, the intervention of a revolution to effect an *extinguishment. The admitted right of the then government to change the established religion ; the admitted, nay 1 might almost say, the boasted, omnipotence of parliament, was competent to put down, by law, a system, and its appendages, which, the legislature itself had set up. Granting, which is the most that could be contended for, that the legislature should have permitted the life interest of the then incumbents to run out, in tenderness to those who engaged in their functions, under a reasonable expectation of the continuance of the then system, that body certainly possessed full power to intercept the contingent and possible claims of their “successors.” It is asking but a small ‘boon, that the same effect shall be given to the revolution ; to a revolution, founded on principles utterly subversive of ecclesiastical coercion and monopoly.
It remains lastly to consider the effect of the laws posterior to the revolution, upon the question before us. The act of November 1776, in the clause so much relied on, (if my view of the subject is right,) is in direct hostility, not only with the spirit of the bill of rights, but with the spirit declared in its own preamble. That preamble recites, “that it is contrary to the principles of reason and justice, that any should be compelled to contribute to the maintenance of a church, with which their consciences will not permit them to join, and from which they can, therefore, receive no benefit.” This inconsistency, considering its illustrious parentage, could only have arisen, from the embarrassment in which that legislature was placed, according to the information of one of the appellants’ counsel in the former argument; from the duress, I had almost said, under which they then stood ; and from the necessity they were then under, to eventuate in some such act as that, as the “price of peace,” between the contending parties. This pressure, however, did not compel them, as there was no necessity for it, to renounce in their preamble, principles, which, as members of the convention, they had so nobly and recently established. Not in the least doubting the information *of the accurate gentleman* who gave it, and which was probably derived from his own personal observation, I have yet had the curiosity to examine the journals of that session upon this subject. In this research, I have abundantly found, the most earnest and urgent petitions and memorials, pro and con, on this important subject; and I can readily conceive, with that gentleman, the difficulties under which that legislature must have laboured, not only from that circumstance, but from the critical complexion of the times, and the necessity of union in our struggle against the common enemy. These considerations, while they exempt from all possible blame, that respectable assembly, for enacting a commentary, so hostile to their own excellent text, certainly weaken the authority of that act, as a cotem-poraneous exposition of the constitution. This memorable act provides, that all dissenters from “the church by law established,” shall be exempt, &c. from levies, &c. for supporting' “the said church as it now is or hereafter may be established, and its ministers.” I beg your attention, sir, to these remarkable expressions. Do gentlemen contend, that in this portrait of the character of the church, this act is a just exposition of the constitution ? Has the constitution permitted the “established church” to continue, or does it tolerate a legislative right to establish a particular church ? No, sir, I believe not. The most that has ever been contended for, by any the least liberal of our fellow citizens, is a legislative right to erect a general establishment of religion. Shall an act thus marked with a want of knowledge of our constitution, or of respect for its clearest principles, be considered, by this court, as a safe and proper guide, in the exposition of that instrument ? I think not. This act of November 1776, so far as it makes a reservation of the several glebes, must either be considered as declaratory of the then law, on that subject, or as investing the episcopal society therewith. In the first view it is only by a legislative construction of the law and constitution *on this subject, which, however respectable (but that respectability is much impaired by the errors and inconsistency, just stated,) must yield to that of the judiciary : in the second view, it is unconstitutional. That destination of the interest of the dissenters, therein, is repugnant to the principles of the constitution, as before stated; and even the just quota appertaining to the episcopalians themselves, could not be so appropriated, without not only encountering difficulties, inseparable from a just ascertainment of proportions, but also prejudging a question, to say the least, of very doubtful issue, and expressly reserved in another part of this act ; namely, that touching the right of the legislature, to establish a general assessment. I shall not dispute, with that counsel, the perpetual force of a legislative compact : but in order to that end, it must be such an one as the legislature has a constitutional power to make.
The same gentleman, in different parts of his argument, considers the act of November 1776, both as an exposition of the constitution, touching an existing right, and as a compact. These positions are incompatible. A compact by the force of the term, imports a new right, and not the continuance of the old. The gentleman may choose between the two positions, but he cannot occupy them both, at the same time. For my part, I rather consider that act as a compact; not, however, a valid one, for want of power in the legislature to endow a particular sect, with public property. It reserves to the “use of the church by law established,” the several glebes, which had been originally given to the use of the ministers. To pass by the glaring misapprehension of this legislature, *1120 in point of fact, already noticed, that an “established church” still existed, this act loses sight of the titles of the ministers before stated, and enlarges the secondary interest of the members of the church into a direct title. It takes a new ground, by depressing the title of the former owners, and exalting that of a new set. It goes much further than the act of 1802 goes, and is a full justification of the power assumed by that act. It *invades and disturbs the sole and exclusive title, (if any,) of existing ministers, if it does not wholly oust them, by vesting the title of the glebes in the church: it admits that the church had not this property before, or else this investiture would have been wholly unnecessary : it also admits that the ministers had either no title to the glebes, or at least not such as was beyond the reach of the legislature. On these two admissions, therefore, which are common to the two acts of 1776 and 1802, it remains to say, whether the latter act is not more defensible than the former ? It does not disturb, as the former does, the possession of existing ministers : it does not bestow as that act does the property of the whole people, on a particular sect: it merely restores to that people, their property, levied for a purpose which has ceased to exist.
These same admissions and consequences, also grow out of the incorporating act of 1784 ; and that act is a great authority, being predicated on the petition of the episcopal church itself. How then can these laws, creating a new right and invading a former one, be considered as a legislative exposition of the constitution touching an existing right ? I have chosen to state that right as it really was ; that is, as existing only in the ministers : but it is wholly immaterial, in my view, whether the grant was to the ministers, or to the church : in either case the granted property has equally reverted : the then character of the church, as well as that of its clergy, has expired with the revolution.
If it be said that the acts of 1776 and 1784 have forestalled the act of 1802, by investing the glebes in the protestaut episcopal church, I answer that the bill of rights had previously forestalled them, by interdicting grants of public property to individuals or societies, except in consideration of public service ; and by inhibiting the legislature from favouring or endowing one religious society in preference to others. The act of 1802 has only put aside the infractions of the constitution, contained in the two former acts. While we are upon the subject of cotemporaneous exposition why *do not the appellants’ counsel give us credit for the act of the same session, docking entails ? That act has assailed what may be considered by some, as a private and perfect right; a right not held from the government, nor dependent on it; a right vested in interest, and only postponed in enjoyment; vested also in persons in esse, and who were ascertained and known. In all these respects the case affected by that act is infinitely more strong, than the case before us. In this case the right is not perfect but dependent; dependent upon the existence of the law and the government, and held.from them; and the person for whom it is set up, is unknown and wholly uncertain : he is, in the emphatical language of our late venerable president, in the case of Carter v. Tyler, a person “in the clouds that expression, there applied to an existing remainderman in tail, is infinitely more applicable to the possible “successor” to a late incumbent. And on what grounds was the act of entails passed? Its preamble recites reasons of inconvenience and impolicy only. No constitutional repugnance is there assigned ; and if any did exist, it is infinitely less strong, than that which intercepts the present claim. I consider that act as a high authority. It was passed by the same legislature who passed the other act alluded to ; and that legislature being free, in this instance, from that embarrassment which besieged them while acting upon the subject of the glebes, the authority of the former act, probably deserves more consideration than that of the latter; the nonexistence too, of those errors and inconsistencies in the former act, which mark the latter, decidedly determines its preference. Besides, the act of entails has always been acquiesced in: it has received the sanction of our courts : and in the case of Carter v. Tyler, it received the sanction of this court,0 upon great consideration. Is it not then a high authority ? That act, to say the least, destroyed the “possibility” of an -interest; but the claim now set up, as paramount to the power of the legislature, is less than a “possibility.” The legislature in passing, and the judiciary in supporting, the act of entails, must have *taken an infinitely bolder ground than is necessary to be occupied on the present occasion. Here, the doctrines of the common law, in its ordinary acceptation, and giving to the revolution the mere effect of dissolving the corporation, suffice for our purpose: But in that case, the legislature proceeded upon great principles. We were thrown into a new situation ; we held the ground of a free and equal government; and the codes and doctrines of dark and arbitrary times, tending to hereditary influence and excessive wealth, were thrown aside,, and disregarded. But I must pause : I am entering into an extensive field : I wish not to prejudge, or anticipate any thing.
In expounding the acts of the convention of 1776, I have adhered to those instruments themselves. I reject all extraneous sources of information. I reject them, in relation to the bill of rights, because those ephemeral circumstances do not apply to great principles, pertaining to our latest posterity. I would receive, with more caution, the legislative exposition of the constitution, contained in the act of November 1776, because the dignity of legislative exposition is lessened, if not lost, when the legislature enacting and expounding is the same. Such an exposition, considered as a judicial decision, seems to contravene great principles. It contravenes that principle requiring a separation of the legislative and judicial departments. The effect of this principle reaches every legislative exposition, more or less; but an union of the powers of passing and executing laws in the same persons, forms no contemptible definition of despotism. But although I deem it right to reject all extraneous information in forming my con- *1121 elusion upon the constitution, I have, as a matter of curiosity, examined the journals of the convention touching' the present subject. I can find in them nothing varying the construction, arising from the instrument itself. In the session of the convention, only one solitary petition on the subject of religious rights was presented. The grievances of the dissenters, great as they were, seemed lost in the greater grievance of America. But *if it were otherwise; if any expressions, contained in the journals of those times, seemed to depart from the spirit breathed in their more solemn and deliberate acts, I should attempt to apologise for that illustrious assembly. I should rather impute them to the infirmities of our nature ; to the resumption of their empire, by ancient habits and prejudices. I should readily excuse a bias, which in the infantine state of free government, may have been only overborne, by the noble effort, by the sublime enthusiasm, which produced the act of government; by that noble fervour, which must animate all men, engaged in the'most noble and important of human transactions. But these patriots require no apology. Their work speaks for itself. It will go down to posterity, and receive the grateful applause of one of the most enlightened and happy of nations. The magnitude of this subject almost carries me beyond the cool deliberation which ought to preside in this place : But I am sure the congenial feelings of those who hear me will readily excuse me.
It has been said that the petitions of the dissenters, in November 1776, did not point to the glebe lands, but only to an exemption from salaries. I think some of those petitions are sufficiently general, and very strong. But if it were otherwise, I am sure there is no hing in the temper of this court, which will repudiate the dearest rights of the people, because, in the first moments of their acquirement, they were ignorant of their existence. The great, though simple principles on which my opinion in the present case is founded, make it unnecessary to pursue the appellants’ counsel through all the technical and secondary learning, with which they have obscured it. They must excuse me, but Ido not think that doctrines of this class, are to decide the fate of this question.
The same consideration induces me to pass over, the remaining acts of assembly, relative to this subject, passed since the revolution. Such of them, as go, to vest, or admit, a title, in the episcopal church, are susceptible of the answers just given to the more important acts of 1776 and *1784. I concur with the allegation in the bill, that the act of 1802 did not deprive the church, of the land in question : but such deprivation, (if I may use so harsh a term,) had previously taken place, and that act only operates, to put in train for a just appropriation, the contemplated portion of the public property.
We were exhorted by one of the appellants’ counsel, at the former argument, and the substance is repeated in the last, “ to put deism to flight, and restore the alters of our forefathers.” If there is a league, of deists or others, in the legislature or elsewhere, to overturn religion, or impair morality, it is to me a subject of the deepest regret. I can never cease to believe, that these are the firmest pillars of civil society, the surest basis of human happiness. For myself, I am now called to discharge a painful duty. That duty must not he obstructed, by any sympathies, or partialities of mine. While sitting in this seat, the stern maxims of judicial independence, scarcely permit me to recognize in the respectable society now before us, the revered patron of my early youth, the depositary of my best wishes.
CARRINGTON, Judge, and LYONS, President.
We have no doubt as to the jurisdiction. For it is, in substance, a bill of quia timet, brought to protect a whole society against disturbance, under colour of a statute, alleged to be unconstitutional; and to prevent injury to its property, in consequence of the sales, and the multiplicity of suits, which would follow from them. These are all proper objects for the interference of a court of equity ; and sustained the jurisdiction of the chancellor.
We are equally clear upon the merits. For it has been frequently decided by the court, that unconstitutional laws are void ; and we think the statute, now under consideration, is of that class.
It is a mistake to suppose, that the church, here, was identified with that of the mother country, and had no capacity to hold lands.
For although the church of England was the prototype, it certainly was not the actual church of Virginia; which was founded by the local legislature ; and its structure and capacities are to be sought for in the laws of the colony only.
By these, the church was organized, and glebes ordered to be purchased for the use of the ministers and their successors, forever. Old Virg. Laws, 2, 3, 4, 251. Which vested those lands exclusively in the established church : for although the price was assessed upon the parish at large, it was done by the legislative authority, at that time supreme : And the power to purchase, created a capacity to hold. Forquando aliquid conceditur, conceditur et id sine quo res ipsa uti non po-test. 11 Co. 52 ; Hob. 234; Cro. Jac. 170, 190.
The question then is, what effect the revolution had upon the property of the church ?
It was contended by the counsel for the appellees, That, if the church had capacity to hold lands before the date of independence, that event destroyed it ; and that, upon the dissolution, the glebes devolved upon the commonwealth. But revolutions are intended to preserve, not to take away rights: Nor was it ever pretended, that an alteration, in the form of a government, affected private property. Such a consequence would prevent all revohitions, as no set of men would ever unite in a measure productive of such fatal effects; and therefore we unhesitatingly pronounce, that the revolution did not produce that result.
A distinction was attempted, however, between a natural person arid an artificial body : The right of the first being admitted ; that of the latter denied: But there is, in fact, no such distinction. For property being a civil institution, the right to it is, in all cases, conferred by law : Which applies *1122 as forcibly to a society, as to an individual; and the change of a government no more affects the claims of the one, than those of the other.
But to obviate this, it was urged, That, although the revolution did not produce the effect directly, it did indirectly; and the reasons assigned for it were, 1. That the society *was dissolved, as the king, one of its integral parts, was gone. 2. That incorporated religious societies are contrary to the sixteenth article of the bill of rights. 3. That the profits of the glebes are emoluments, which one religious society cannot take to its separate use, without a violation of the fourth article of that instrument.
Neither of these propositions is true:
Not that which relates to the abolition of the kingly office.
1. Because the king was not an integral part of the established church. For he was never declared to be so by any law ; and he exercised no acts with regard to the institution, except as one of the component parts of the general legislature of the colony.
2. Because a society is not dissolved by the destruction of one of its parts, unless the capacity, to produce the end of its association, ceases. Grot. B. 2, ch. 9 ; Puff. B. 8, ch. 12; 2 Ruth. Inst. 637, 638. Which is agreeable to the doctrines of the common law. For no case decides that the loss of one of its integral parts will destroy a corporation, if the rest can proceed without the lost member. On,the contrary, it is only when such an integral part is gone, as, without its existence, the functions of the society cannot be exercised, that the corporation is dissolved for any purpose. Rex v. Pasmore, 3 T. Rep. 199 ; Bracken v. The College, 3 Call, 575. But the whole organization of the church, its competency to transact its affairs, and the entire polity of the body remained the same after the revolution, as before ; and consequently that event did not affect it.
Not that with respect to the sixteenth article of the bill of rights :
Because there is nothing in that article, which forbids the continuation of the establishment, or the incorporation of religious societies. For the whole relates to the rights of conscience, and the mutual charities which men owe each other.
Not that with respect to the fourth article of the bill of rights :
*lstly. Because that article relates to emoluments and privileges, subsequently, to be created in favour of the great officers of government, as will be shewn hereafter ; and not to property, theretofore, legally acquired, either by individuals, or lawful societies. As to which, the observation in The Case of the County Levy, [5 Call, 139,] cited by the appellants’ counsel, that it would be unfair to extend general words of exclusion, used by the framers of the constitution, for one purpose, to other objects not then under contemplation, strictly applies. For, there, the argument of the court was, that the general words excluding the power of laying taxes, except by the representatives of the people, ought not to be extended to levies to be laid by the county courts, according to long established usage, for the exigencies of the counties. And it is equally correct to say, in the present case, that when the framers of the constitution were prohibiting emoluments and privileges of a political character, namely, hereditary rights to magistrates, legislators and judges, the only-enumerated objects of consideration, they did not intend to exclude individuals, or existing societies, from the enjoyment of property already acquired under ancient statutes, enacted by legislatures unquestionably competent, at the time, to make them.
2dly. Because the whole article, according to grammatical and legal construction, relates to magistrates, legislators and judges only.
For, in the first place, the words, “public services,” are equivocal, as they apply not only to officers concerned in the general administration of government, but to subordinate agents, acting for the benefit of the community also ; as, for instance, to public teachers, and other occupations, conducive directly, or indirectly, to the public benefit. And, although this particular church was not the only one in the state, and therefore so far the right might be said to be partial, yet that forms no objection to the principle, as similar benefits may be conferred on the rest, so as to produce general equality. For the grant of a small piece of land to any religious society, *to support a minister to teach the principles of Christianity, would be a grant for a public purpose ; not only upon the reason of the thing, but upon the expression and meaning of the last article of the bill of rights : which declares, “ that no government, or the blessing of liberty, can be preserved to any people, but by a firm adherence to justice, moderation, temperance, frugality, and virtue and “that it is the mutual duty of all to practice Christian forbearance, love and charity towards each otherwhich latter words shew, that the Christian religion was that which was contemplated throughout the whole article, as none but Christians would be conversant in the principles and duties prescribed by it. But, if adherence to such principles, and the exercise of such duties, be indispensable to the preservation of liberty and the happiness of the people, it is obvious, that a reasonable grant to a religious society, for the purpose of inculcating them, would not,.(more than to a college, or other seminary of learning,) be unconstitutional. And, accordingly, it never has been disputed, that the property of the college of William & Mary continued inviolable after the revolution, notwithstanding their possessions were donations by the crown, out of the public domain, and the members not officers of government, rendering public services to the state : and notwithstanding, too, one of the professorships, that of divinity, was devoted to the doctrines of the established church ; the preparing ministers for which was one main object for establishing the college, as avowed in several of the early statutes, and the charter made in conformity to them. Act 1660-1, ch. 20, (2 Hen. Stat. 25); Act, March 1661-2, ch. 18, (2 Hen. Stat. 56) ; 3 Call, 574. Which seems to put the question to rest.
But, independent of this, the remark is correct, that, in political language, emoluments and privileges most naturally apply to the rewards given to those concerned as officers of government, in the general administration *1123 of public affairs : and that they were so understood, in this article, is obvious. For they are connected with the words public services ; *which, by the subsequent parts of the sentence, are transferred to the three great departments of government, namely, the executive, legislative and judiciary. 1. Because the subsequent words' connect the clauses of the period together, and signify the relation which they bear to each other ; for otherwise, the words, “ which not being descendible,” would be useless, as they would mean nothing, and the after member of the sentence would be complete without them. 2. Because the whole article is but one sentence; each subsequent part connected with, and dependent on, the preceding. For the word, “which,” refers to the words, “ public services,” as its antecedents, and the word “ neither,” in like manner, to the word “which:” thus embracing the whole of the antecedents, and connecting them with the subsequent words, magistrate, legislator and judge. So that the latter member of the sentence is but a corollary drawn from, and dependent on, its correlative term “public services ;” which it defines and restricts. The fair interpretation, therefore, is, that “emoluments” and “privileges,” (which are the rewards for services by the officers administering the government,) not being descendible, the offices, from which the services were to proceed, ought not to be hereditary. In this view, which is most consistent with the context, and general intent, of the article, the case is nothing more than the ordinary course of explaining the generality of the preceding words, by those which follow; and confining the operation of the first, to the specific terms of the latter. Which interpretation has the additional advantage, that it preserves and gives effect to all the words in the article; whereas the other virtually suppresses the intervening words, (“which not being descendible,”) to the injury of the sentence ; and, therefore, ought to be repudiated.
3dly. Because any other construction would be attended with the most inconvenient consequences, as it would take, from the legislature, the power of making a gift either to a community, or an individual, unless engaged in some public service, although the occasions of society often require legislative ^grants for purposes wholly individual, or partial, in their nature.
Upon no sound construction, therefore, of the bill of rights, compared with the laws antecedent to the revolution, can the church be considered as dissolved by that event, or divested of its property, in consequence of it : and the uniform interpretation and practice of the country have been agreeable to this opinion.
In support of that proposition, we refer, in the first place, to the transactions, at the period of the revolution, relative to the church : which we are enabled to state with more confidence, as one of us was a membei of the convention, that framed the bill of rights and constitution.
On the 20th of June, 1776, the baptist society petitioned for freedom of worship ; but made no complaint as to the glebes.
On the 29th of that month, the constitution was prepared, without any exception, from any quarter, to the church establishment.
On the 4th of July, 1776, independence was declared ; and, on the next day, the convention proceeded to reform the book of Common Prayer, and made sundry alterations in the litany and prayers.
On the 7th of October, 1776, the same convention, without any new election, met the senate, in general assembly ; and took into consideration, the petitions of the dissenting sects against the church establishment, with the counter petition of the church. The whole was discussed, at large, in both houses, and resulted in the act, of October session 1776, ch. 2, authorizing vestries to make assessments, upon the parishes, for the discharge of the past engagements, and the maintenance of the poor; and settling the right of the church to the glebes. Chan. Rev. 39.
This contemporaneous exposition, by those who framed the constitution, was followed by the incorporating act of 1784, ch. 87; by that of 1786, ch. 12, which reserved, to each religious society, the property belonging to it; and by *that of 1788, ch. 47, declaring the protestant episcopal church successors of the former church, and capable of holding its property.
As far, then, as construction and practice, both ancient and modern, can settle any question, this appears to be settled.
But it was said, that neither the convention, nor the legislature, could alter the constitution ; or give it a meaning which the words would not bear.
To which we answer,
1. That if that position were true to the whole extent, it would not affect the case ; because we have, already, endeavoured to shew, that the construction and practice were in strict accordance, with the intent and letter of the instrument; and, therefore, that the case, supposed by the position, does not exist on the present occasion.
2. That the constitution, and the subsequent acts of the convention, stand upon the same ground. For both depend upon the acquiescence of the people, as the convention was not deputed to make the constitution ; or to pass laws under it; and, therefore, if the people acquiesced under the constitution, they acquiesced in the interpretation also.
3. That written constitutions are, like other instruments, subject to construction ; and, when expounded, the exposition, after long acquiescence, becomes, as it were, part of the instrument; and can, no more, be departed from, than that. The Commonwealth v. Caton, [4 Call, 5,] and The Case of the County Levy, [5 Call, 139,] cited by the appellants’ counsel.
4. That it is unimportant, therefore, whether the legislature can, or cannot, now, bestow other property, upon religious societies ; for, either way, their contemporaneous and subsequent decisions amount to so many recognitions of the first interpretation by the convention, that the church continued ; and that the then existing glebes belonged to it. Which, as before observed, makes, in effect, the construction, as to those subjects, part of the instrument.
*It was said, that, if the constitution did not, the act of incorporation, in *1124 1784, had dissolved the church ; and that the property was thereby thrown back upon the public. The answer of Mr. Randolph, however, to that objection, is perfectly satisfactory, for the identity of the church was not destroyed by that act, as the change was made in the name only, (which was altogether collateral,) and, at the instance of ihe church itself, asking no alteration of its constitution ; but, substantially, professing to retain the principles, rites and discipline of its first institution. So that the case supposed has not happened.
But what would have been the effect, upon the property, had there been a dissolution of the church, as a body politic ? whether,it would have returned to the vendor? would have remained, with the followers of the church ? or would have continued in the grantees, named in the deed, to the use of those followers, or to the use of the grantees themselves, in case no trust remained for the followers ? is perhaps uncertain : But there seems to be very little room to suppose, that it would have devolved, upon the commonwealth. For, as the legal estate would have stood in the trustees, it could only have been called out by a bill in chancery ; and the state would have had no equity against those members of the church who claimed it, for the original object of the grant. It is unnecessary, however, to examine that question ; because the cases cited, by the appellants’ counsel, prove, that no alteration, either in the name, or in the form of a corporation, dissolves it; and much less, in a case like this, where the change was made, at the instance of the church, in order to strengthen its rights, and preserve its capacities.
Upon the whole, we think, that the church had a right to the glebes, at the date of the revolution ; that, that event had no effect upon the title; that nothing has happened since to divest it; that the act of 1802 is unconstitutional ; and that the injunction ought to have been awarded. But, as the other judges are of a different opinion, the decree *of the chancellor stands, and is to be affirmed, as upon a division of the court.
Memorandum. — The above case had been argued at a former term ; and, during the succeeding vacation, Mr. Pendleton, then president of the court, and who sat in the cause, prepared his opinion in writing, (which the reporter has seen,) that the glebes belonged to the protestant episcopal church ; and that the act of 1802, was unconstitutional. But the opinion was not delivered, as he died the night before it was to have been pronounced.

Mr. Randolph.